| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>DISTRICT OF UTAH | |
| TVPX ARS, INC., in its capacity as Investment Trustee for the Dougherty Air XXI Investment Trust, LLC,<br><br>       Plaintiff,<br><br>       v.<br><br>BOMBARDIER, INC., a Canada corporation,<br><br>       Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 1:17-cv-107-RJS-PMW<br><br>Chief District Judge Robert J. Shelby<br><br>Chief Magistrate Judge Paul M. Warner |

       Plaintiff TVPX ARS, Inc. is the current owner of the rights to a CRJ-200 aircraft (the Aircraft) initially sold in 1999 by Defendant Bombardier, Inc. Upon purchase of the Aircraft, TVPX assumed the rights to certain support obligations provided by Bombardier. Bombardier's support obligations were enumerated in various agreements. Under the terms of those agreements, Bombardier's duty to provide support to TVPX was conditioned on TVPX fulfilling certain obligations—one of which was to return the Aircraft to Bombardier by a specified date. TVPX claims Bombardier breached the agreements by failing to fulfill its support obligations. Bombardier maintains it had no duty to fulfill the support obligations because TVPX did not first comply with the condition that TVPX timely return the Aircraft. TVPX ultimately filed suit, asserting causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. Owing to the number of relevant parties and agreements involved, the facts underlying TVPX's claims are complicated. The legal issues arising out of those facts are not. Construing the various contracts under New York law, the task before the court is to identify the date by which TVPX was required to return the Aircraft to Bombardier if TVPX wished to compel Bombardier to provide the relevant support obligations.

Now before the court are the parties' cross-motions for summary judgment, as well as TVPX's Motion in Limine seeking exclusion of Bombardier's rebuttal expert testimony.[1] TVPX moves for partial summary judgment on its breach of contract and promissory estoppel claims, while Bombardier moves for summary judgment on all of TVPX's claims. For the reasons discussed below, the court GRANTS Bombardier's Motion for Summary Judgment, DENIES TVPX's Partial Motion for Summary Judgment, and DENIES as MOOT TVPX's Motion in Limine.

## I. BACKGROUND[2]

This case involves a series of transactions and agreements among several entities related to the Aircraft's initial sale and subsequent leases. Below, the court outlines the critical aspects of these transactions and agreements.

### A. Leveraged Lease Agreement

Bombardier is an aircraft manufacturer. On December 10, 1999, Bombardier sold a CRJ-200 aircraft to the First Union Trust Company, as Owner Trustee.[3] The transaction was memorialized under what is commonly known in the airline industry as a leveraged lease[4]—a financing structure that "place[s] ownership of the aircraft in a profitable entity—the Owner Participant—which would put up a portion of the acquisition cost and take accelerated depreciation against its own profits."[5] ICX Corporation acted as the Owner Participant in the

---

[1] Dkt. 33 (TVPX's Motion in Limine); dkt. 34 (TVPX's Redacted Motion for Summary Judgment); dkt. 38 (Bombardier's Redacted Motion for Summary Judgment).

[2] The facts set forth in the background are undisputed unless stated otherwise.

[3] Dkt. 34 at 7, ¶¶ 1–2.

[4] *In re Delta Air Lines, Inc.*, 608 F.3d 139, 141 (2d Cir. 2010).

[5] *Id.* at 142.

transaction.[6] As such, it bore a portion of the Aircraft purchase price as an "equity investor (in order to obtain the benefits of accelerated depreciation)."[7]

B. **Midway Lease**

The same day Bombardier sold the Aircraft to First Union, First Union executed a lease agreement with Midway Airlines Corporation (the Midway Lease).[8] Bombardier was not a party to the Midway Lease.[9] The Midway Lease detailed Midway's and First Union's rights and responsibilities regarding payments, insurance, and inspection of the Aircraft.[10] Most relevant here, the Midway Lease specified the date Midway was to return the Aircraft to First Union according to the lease's Basic Term.[11] The Midway Lease defines 'Basic Term' as the "period commencing at the beginning of the day on the Delivery Date and ending at the end of the day on the Expiration Date."[12] Expiration Date is defined as "the date specified as such in the Lease Supplement executed and delivered on the Delivery Date."[13] Lease Supplement No. 1 to the Midway Lease designates the Delivery Date as December 15, 1999, and the Expiration Date as June 15, 2016.[14]

C. **Residual and Deficiency Agreement**

Also on December 10, 1999, Bombardier entered into two agreements with ICX and First

---

[6] Dkt. 34 at 7, ¶ 2.

[7] *In re Delta Air Lines, Inc.*, 608 F.3d at 141.

[8] Dkt. 34 at 7, ¶ 3.

[9] Dkt. 38 at 5, ¶ 4.

[10] *See generally* dkt. 39-3.

[11] Dkt. 38 at 5, ¶ 6; dkt. 39-3 at BOM_167.

[12] Dkt. 38 at 5, ¶ 5; dkt. 39-3 at BOM_00187.

[13] Dkt. 38 at 5, ¶ 5; dkt. 39-3 at BOM_191.

[14] Dkt. 38 at 5, ¶ 5; dkt. 42-3 at BOM_ 210–11.

3

Union—the Residual Agreement and the Deficiency Agreement.[15] Under the Residual Agreement, Bombardier assumed certain support obligations at the expiration of the Basic Term of the Midway Lease.[16] Two support obligations are relevant here: (1) a remarketing obligation and (2) a residual value guarantee (RVG).[17] First, the remarketing obligation required Bombardier to act as ICX's "exclusive" remarketing agent for the Aircraft during a specified Remarketing Period.[18] The Remarketing Period was set to begin at the end of the Basic Term and concluded 240 days later.[19]

Second, the RVG required Bombardier to guarantee payment of up to a specified Maximum Payment Amount if the value of the Aircraft at the end of the Lease[20] was less than the guaranteed Residual Amount.[21] Section 4 of the Residual Agreement conditioned Bombardier's requirement to pay the RVG on the Aircraft being returned within ninety days of the Return Date.[22] The Residual Agreement defines Return Date as the "date on or following the expiration of the Basic Term . . . on which the Lessee returns the Aircraft to the Lessor . . . and which is not later than ninety (90) days after the expiration of the Basic Term."[23]

Finally, Bombardier verified its intention to meet its support obligations via Section 7 of

---

[15] Dkt. 34 at 8, ¶¶ 5–6. The Residual Agreement was between Bombardier and ICX, while the Deficiency Agreement was between Bombardier, ICX, and First Union. Dkt. 39-2 (Deficiency Agreement) at BOM_000064; dkt. 39-4 (Residual Agreement) at BOM_000104.

[16] Dkt. 38 at 6, ¶¶ 7–8.

[17] *Id.* at ¶ 8.

[18] Dkt. 38 at 6, ¶9; dkt. 39-4 §2(a) at BOM_108.

[19] Dkt. 38 at 6, ¶9; dkt 39-4 §1(b) at BOM_108.

[20] The Residual Agreement defined the term "Lease" as the Midway Lease. *See* Dkt. 39-4 at BOM_000104.

[21] Dkt. 34 at 8, ¶ 7; dkt. 39-4 §§1, 4(a) at BOM_104–08, 111.

[22] Dkt. 39-4 §4(a) at BOM_111–12 (stating "[i]f the Return Date shall have occurred, then within ninety (90) days after the earlier to occur of (x) the end of the Remarketing Period or (y) a sale of the Aircraft (including sale to the Lessee) . . . the Owner Participant shall have the right to deliver to Bombardier a notice . . . of the Payment Amount, if any, for which Bombardier is liable under Section 4(b)").

[23] *Id.* § 1 at BOM_108.

4

the Residual Agreement, titled "Agreement Absolute."[24]

The Residual Agreement permitted ICX, as Owner Participant, to assign its rights under the agreements.[25]

### D. Support Amendment Agreement

In 2001, the Midway Lease was terminated when Midway defaulted.[26] As a result, First Union and ICX sought to enter into a new lease with Air Wisconsin Airline Corporation (the AWAC Lease). Before ICX entered into the AWAC Lease, it negotiated and entered into a Support Amendment Agreement (SAA) with Bombardier.[27] The SAA was meant to allow First Union, ICX, and Bombardier to forgo the need to renegotiate the Residual Agreement and the Deficiency Agreement in coordination with the pending AWAC Lease.[28]

---

[24] Dkt. 39-4 § 7 at BOM_000114. Section 7, states:

> The obligations hereunder of Bombardier shall remain in full force and effect without regard to, and shall not be impaired or affected by, any act or omission to act of any kind by the Owner Participant, or any other Person, or any other circumstances whatsoever which might constitute a legal or equitable discharge of a guarantor, including but not limited to, (a) any waiver, consent, extension, indulgence, surrender, assignment or other like action relating to this Agreement or any of the other Operative Agreements . . . (c) the invalidity, illegality or unenforceability of this Agreement; the Lease, any other Operative Agreement, or any other document for any reason, (d) any set-off, counterclaim, recoupment, defense or other right Bombardier may have against Lessee, Owner Trustee or any other person . . . (f) any amendments, modifications or supplements of or to the Lease or any other Operative Agreement, or any related document; it being the intention of Bombardier that its obligations under this Agreement shall be absolute and unconditional in any and all circumstances and that such obligations shall only be discharged by the payment in full of all sums, and the full and complete performance and discharge of all covenants, agreements and obligations, as agreed to by Bombardier in accordance with the terms hereof; provided that, notwithstanding the foregoing, unless otherwise consented to in writing by Bombardier, the obligations of Bombardier hereunder shall not be affected in any manner by any consent, waiver, amendment, modification or supplement to the Lease or any other Operative Agreement as in effect on the date of the execution and delivery of this Agreement and when determining any obligation of Bombardier hereunder, the extent of such obligation shall be determined as if such consent, waiver, modification, amendment or supplement had not occurred, other than any such consent, waiver, amendment, modification or supplement which does not have an adverse effect on Bombardier or which has been consented to or approved by Bombardier in writing. *Id.*

[25] Dkt. 34 at 9, ¶ 9; dkt. 39-2 § 14(c) at BOM_000091; dkt. 39-4 § 16(b) at BOM_000124.

[26] Dkt. 34 at 10, ¶ 11.

[27] Dkt. 38 at 9, ¶ 12.

[28] *Id.* at 13, ¶ 21.

The SAA included the following relevant provisions:

Section 2, *Deficiency Agreement*

> ICX will enter into a lease (the 'Lease') with Air Wisconsin Airline Corporation ('AWAC') for the Aircraft, for a term coterminous with the Midway Lease (plus up to two months if requested by ICX) and on terms and conditions otherwise agreed between ICX and AWAC consistent with Bombardier's rights under its CRJ financing support obligations to AWAC under the Purchase Agreement . . . .[29]

Section 3, *Residual Agreement*

> The parties hereto agree that upon ICX entering into the Lease, the Residual Agreement shall be amended so that it refers to AWAC and not to Midway, and to the Lease and not to the Midway Lease. For the avoidance of doubt, no other terms of the Residual Agreement shall be amended, including without limitation the terms "Base Residual Amount", "Residual Amount" and "Maximum Payment Amount."[30]

Section 10, *Headings*

> The headings of the various sections of this Agreement are for the convenience of reference only and shall not modify, define, expend [sic] or limit any of the terms or provisions hereof.[31]

### E. AWAC Lease

On February 22, 2002, First Union and AWAC entered into the AWAC Lease.[32] The Basic Term of the AWAC Lease expired by its terms on April 4, 2017.[33] Bombardier was not a party to the AWAC Lease.[34]

### F. Assignments of the Aircraft

Beginning on January 20, 2005, the rights to the Aircraft and the AWAC Lease

---

[29] Dkt. 34 at 10–11, ¶ 13; dkt. 39-6 § 2 at BOM_000304.

[30] *Id.* at 11, ¶ 13 (error in original); dkt. 39-6 § 3 at BOM_000304.

[31] Dkt. 34 at 10–11, ¶ 13; dkt 39-6 § 10 at BOM_000306.

[32] Dkt. 34 at 11, ¶ 15. First Union entered into the AWAC Lease on behalf of ICX as well. *Id.*

[33] *Id.* at ¶ 16; *see generally* dkt. 39-7.

[34] Dkt. 38 at 11, ¶ 24.

transferred through a series of assignments, culminating in a Third Assignment to TVPX on November 29, 2011 (the Third Assignment).[35] Bombardier consented to the Third Assignment via a Manufacturer's Consent:

> As of the date hereof, Manufacturer [Bombardier] hereby acknowledges and agrees to the assignment of the Support Amendment Agreement, the Deficiency Agreement, and the Residual Agreement to the Assignee and agrees to recognize and perform its obligations for the benefit of, Assignee as the "Owner Participant" thereunder and agrees that the conditions in Section 8 of the Support Amendment Agreement, Section 14(c) of the Deficiency Agreement, and Section 16(b) of the Residual Agreement to such assignments have been met with respect to these transfers.[36]

Throughout the three assignments, Bombardier conducted extensive due diligence but was not aware that the Expiration Date written into the AWAC Lease—April 4, 2017—was different than the date required under the Midway Lease—June 15, 2016.[37]

### G. Dispute Over Basic Term in AWAC Lease

In October 2014, TVPX asked Bombardier to consent to TVPX assigning TVPX's interest in the Aircraft to Global Principal Finance Company, LLC (Proposed Fourth Assignment).[38] In contrast to its past practice, Bombardier requested a copy of the AWAC Lease before it would consent to the assignment.[39] After reviewing the AWAC Lease, Bombardier learned it did not expire at the same time as the previous Midway Lease.[40] Bombardier notified TVPX of the inconsistencies in the termination dates between the AWAC Lease and the Midway

---

[35] Dkt. 34 at 11–14, ¶¶ 17–23.

[36] *Id.* at 13, ¶ 22; dkt. 34-3 at P000603.

[37] Dkt. 34 at 16, ¶¶ 31–33. TVPX disputes the materiality of Bombardier's knowledge of the termination date of the AWAC Lease, arguing: "none of the three manufacturer's consents executed by Bombardier in connection with the assignments of the Aircraft is conditioned upon Bombardier's knowledge of the AWAC Lease terms, including without limitation its Expiration Date." Dkt. 54 at 14.

[38] Dkt. 38 at 14, ¶ 39.

[39] *Id.* at 14–15, ¶¶ 40–41. TVPX disputes the materiality of this fact because Bombardier's knowledge of the AWAC Lease was not necessary for the execution of the assignment. Dkt. 54 at 16–17.

[40] Dkt. 38 at 15, ¶ 44.

Lease.[41] TVPX responded by requesting to amend the Residual and Deficiency Agreements in order to continue with the Proposed Fourth Assignment.[42] The parties ultimately were unable to agree on terms for a proposed amendment to the Residual and Deficiency Agreements.[43]

Beginning in March 2017, TVPX contacted Bombardier concerning Bombardier's support obligations under the Residual Agreement.[44] Bombardier responded that it was under no obligation under the Residual Agreement because TVPX did not comply with the terms of the SAA—namely, that the AWAC Lease run coterminous with the Midway Lease.[45] On June 9, 2017, TVPX again contacted Bombardier requesting that Bombardier comply with its RVG support obligations.[46] Bombardier again denied it had an obligation to pay under the terms of the Residual Agreement.[47] Despite the disagreement, TVPX returned the Aircraft to Bombardier on May 4, 2017.[48] The return of the Aircraft fell within the Basic Term of the AWAC Lease,[49] but roughly ten months after the Basic Term of the Midway Lease.[50]

---

[41] *Id.* at 16, ¶ 45.

[42] *Id.* at ¶ 46.

[43] *Id.* at 16–17, ¶ 48.

[44] *Id.* at 18, ¶ 52.

[45] *Id.* at ¶ 54.

[46] *Id.* at ¶ 55.

[47] Dkt. 34 at 18, ¶ 42.

[48] *Id.* at 17, ¶ 37.

[49] *See generally* dkt. 39-7.

[50] Dkt. 39-3 at BOM_ 210–11.

**H. Procedural History**

TVPX brought suit on June 26, 2017, asserting causes of action against Bombardier for breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel.[51] After discovery, the parties filed the present cross-motions for summary judgment.[52]

## II.   LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as matter of law."[53] A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[54] Under this standard, the court will "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party."[55] The parties' cross-motions "are to be treated separately; the denial of one does not require the grant of another."[56]

Below, the court takes up in turn TVPX's claims for breach of contract, breach of the implied covenant, and promissory estoppel. In analyzing these causes of action, the court applies New York law, as required by the relevant agreements.[57]

## III.   ANALYSIS

**A. TVPX's breach of contract claim fails as a matter of law.**

TVPX claims that Bombardier breached the SAA and the Residual Agreement by failing

---

[51] Dkt. 2 at 9–12.

[52] Dkt. 34 (TVPX's Motion); dkt. 38 (Bombardier's Motion).

[53] Fed. R. Civ. P. 56(a).

[54] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[55] *Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008, 1010 (10th Cir. 2008).

[56] *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

[57] *See* Dkt. 39-4 § 16(k) at BOM_000126 (Residual Agreement); dkt. 39-6 § 13 at BOM_000306 (SAA); dkt. 39-11 § 14 at BOM_000337 (Third Assignment).

to fulfill its support obligations under the agreements. Bombardier responds that it is not required to fulfill its support obligations because TVPX failed to perform under the agreements. The court agrees with Bombardier.

Under New York law, the elements of a cause of action for breach of contract are: (1) formation of a contract, (2) performance by plaintiff, (3) defendant's failure to perform, and (4) resulting damage.[58] Contracts are "interpreted as a whole and all writings forming part of the same transaction are interpreted together."[59] "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent."[60] The best evidence of the parties' intent is the language of the contract itself.[61] When looking at the language of a contract, "form should not prevail over substance and the sensible meaning of words should be sought."[62] That is, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."[63]

"A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'"[64] "[P]rovisions in a contract are not ambiguous merely because the parties interpret them differently."[65] Alternatively, "contract language is ambiguous when it is reasonably susceptible of more than one interpretation and

---

[58] *See JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 893 N.Y.S.2d 237, 239 (2d Dep't 2010); *Furia v. Furia*, 498 N.Y.S.2d 12, 13 (2d Dep't 1986).

[59] *Pangburn v. Stanley Mark Strand Corp.*, 24 N.Y.S.2d 97, 99 (Sup. Ct. 1940).

[60] *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (App. Div. 2002).

[61] *Id.*

[62] *Pangburn*, 24 N.Y.2d at 100.

[63] *Greenfield*, 98 N.Y.2d at 569 (citation omitted).

[64] *Id.* (citations omitted) (alterations in original).

[65] *Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd.*, 88 N.Y.2d 347, 352 (App. Div. 1996).

there is nothing to indicate which meaning is intended, or where there is contradictory or necessarily inconsistent language in different portions of the instrument."[66] Whether a contract is ambiguous "is a question of law to be resolved by the courts."[67]

Here, the parties' intent is clear from the face of the SAA and the Residual Agreement. The critical issue with respect to TVPX's breach of contract claim is identifying which Expiration Date governs the return of the Aircraft. TVPX maintains Bombardier breached its support obligations under the SAA and the Residual Agreement because the April 4, 2017 Expiration Date in the AWAC Lease governs.[68] The court disagrees.

The SAA clearly and unambiguously establishes that the forthcoming AWAC Lease must expire on the same date as the Midway Lease. Section 2 of the SAA states: "ICX will enter into a lease (the 'Lease') with Air Wisconsin Airline Corporation ('AWAC') for the Aircraft, for a term coterminous with the Midway Lease (plus up to two months if requested by ICX)."[69] The Midway Lease defines the Expiration Date as June 15, 2016.[70] The court finds the meaning of these provisions when read in concert to be "definite and precise."[71] Interpreting the SAA under its plain terms, it is clear the parties agreed the Expiration Date of the AWAC Lease would be June 15, 2016—not April 4, 2017.

In light of this determination, it is undisputed that TVPX failed to perform its obligations under the terms of the Residual Agreement. TVPX concedes and the court agrees that the

---

[66] *Natt v. White Sands Condo.*, 943 N.Y.S.2d 231, 232 (App. Div. 2012) (citations and internal quotation marks omitted).

[67] *W. W. W. Assocs., Inc. v Giancontieri*, 77 N.Y.2d 157, 162 (App. Div. 1990).

[68] Dkt. 34 at 20–22.

[69] Dkt. 39-6 § 2 at BOM_000304.

[70] Dkt. 39-3 at BOM_000211.

[71] *Greenfield*, 98 N.Y.2d at 569.

"occurrence of the Return Date was a condition precedent to Bombardier's payment obligation under the residual agreement."[72] In other words, under the terms of the Residual Agreement, Bombardier's support obligations were conditioned on TVPX returning the Aircraft within ninety days after the expiration of the Basic Term which was September 13, 2016. It is undisputed that TVPX did not return the Aircraft until May 4, 2017—ten months after the Basic Term's expiration.[73] To establish its claim for breach of contract, it is TVPX's burden to show that it performed under the terms of the contracts it claims were breached. TVPX's failure to perform under the SAA and Residual Agreement by not returning the Aircraft by the date required in those agreements is thus fatal to its claim.

TVPX's further arguments in support of its breach of contract claim are unpersuasive. TVPX first argues the Expiration Date of the AWAC Lease controls because the SAA replaced the Midway Lease with the AWAC Lease "for purposes of the Residual Agreement."[74] TVPX's argument suggests the SAA incorporated by reference all of the terms and conditions of the AWAC Lease into the Residual Agreement. The court concludes it did not.

For a document to be incorporated by reference into an agreement, "two essential elements must be satisfied."[75] First, "the document to be incorporated must be identified with sufficient specificity."[76] Second, "there must be a clear manifestation of an intent to be bound by

---

[72] Dkt. 54 at 28–29 n. 3. TVPX also argues that Bombardier breached its remarketing obligation under the Residual Agreement. Dkt. *Id.* at 30. This argument fails, however, because Bombardier's remarketing obligations ended 240 days after the end of the Basic Term (Remarketing Period). Dkt 39-4 §1(b) at BOM_108. And it is undisputed that TVPX did not approach Bombardier with respect to its remarketing obligations until after the expiration of the Remarketing Period. *See* dkt. 54 at 22.

[73] Dkt. 54 at 30.

[74] *Id.* at 27–30.

[75] *Federated Mut. Ins. Co. v. Woodstock '99, LLC*, 140 F. Supp. 2d 225, 228 (N.D.N.Y. 2001).

[76] *Id.*

the terms of the incorporated instrument."[77] Only the second element is at issue here. The SAA states the Residual Agreement is to be amended so that it "refers" to the AWAC Lease. The requirement that the Residual Agreement "refer" to the AWAC Lease, however, does "not provide a persuasive basis for the application of the doctrine of incorporation by reference."[78] The SAA contains no language manifesting intent that the terms of the AWAC Lease will replace any agreed upon terms—such as those existing in the Residual Agreement or the SAA. In the absence of any clear manifestation of intent, the Expiration Date in the AWAC Lease does not govern over the clear language expressed in the SAA that the AWAC Lease would run for a term coterminous with the Midway Lease.

TVPX next argues the SAA's requirement that the AWAC Lease be for a "term coterminous with the Midway Lease" applies only to the Deficiency Agreement.[79] This argument too is foreclosed by the plain language of the SAA. It is true the language requiring that the AWAC Lease run coterminous with the Midway Lease appears under Section 2 of the SAA, titled "Deficiency Agreement."[80] The placement of the coterminous language under the Deficiency Agreement heading, however, provides no interpretative value in light of the clear and unambiguous language of the clause itself.[81] Section 2(a)—which contains the coterminous language—makes no reference to the Deficiency Agreement, but refers broadly to the AWAC

---

[77] *Id.*

[78] *Id.* (stating the fact a document contains the word "reference" does "not provide a persuasive basis for the application of the doctrine of incorporation by reference").

[79] Dkt. 54 at 28.

[80] Dkt. 39-6 § 2(a) at BOM_000304.

[81]*Albany Med. Ctr. v. Preferred Life Ins. Co. of New York*, 851 N.Y.S.2d 843, 847 (2008) (rejecting a party's interpretation of a medical insurance policy based on a heading, stating a "reference in the heading . . . cannot alter or limit the effect of the unambiguous language in the body of the clause itself").

13

Lease.[82]  By contrast, Section 2(b) refers explicitly to the parties' obligations with the respect to the Deficiency Agreement.[83]  More importantly, Section 10 of the SAA supplies the parties' mutual intent that: "The headings of the various sections of this Agreement are for the convenience of reference only and shall not modify, define, expend [sic] or limit any of the terms or provisions hereof."[84]  It is evident the parties intended the coterminous language of Section 2(a) to apply to the AWAC Lease and not the Deficiency Agreement.

Finally, TVPX argues Section 7 requires Bombardier to provide support obligations under any and all circumstances.[85]  The court does not read Section 7 to place such an expansive duty on Bombardier.  Moreover, TVPX's interpretation of Section 7 runs afoul of several basic contract interpretation principles under New York law.

First, TVPX's interpretation of Section 7 would render the express condition precedent included in Section 4(a) of the Residual Agreement meaningless.  "It is a cardinal rule of contract construction that a court should 'avoid an interpretation that would leave contractual clauses meaningless'"[86]  If the court were to adopt TVPX's reading of Section 7, it would require Bombardier to fulfill its support obligations even if Section 4(a)'s express condition to return the Aircraft was not satisfied—thus, rendering the condition precedent without effect.[87]

Second, under New York law, "clauses similar to the phrase 'notwithstanding any other

---

[82] Dkt. 39-6 § 2(a) at BOM_000304.

[83] *Id.* § 2(b) at BOM_000304.

[84] *Id.* § 10 at BOM_000306.

[85] Dkt. 34 at 26–28.

[86] *Natixis Real Estate Capital Tr. 2007-HE2 v. Natixis Real Estate Holdings, LLC*, 50 N.Y.S.3d 13, 18 (N.Y. App. Div. 2017) (citation omitted).

[87] *See id.* (stating the court is required to harmonize all contractual provisions "so as not to leave any provision without force and effect").

provision' trump conflicting contract terms."[88] Section 7 contains such a phrase:

> notwithstanding the foregoing, unless otherwise consented to in writing by Bombardier, the obligations of Bombardier hereunder shall not be affected in any manner by any consent, waiver, amendment, modification or supplement to the Lease or any other Operative Agreement as in effect on the date of the execution and delivery of this Agreement.[89]

This language makes clear that Bombardier's support obligations will not be affected by any other agreement, unless consented to in writing by Bombardier. To the extent any preceding language in Section 7 is in conflict with this statement, it must yield. Furthermore, there is no evidence on the record before the court suggesting Bombardier consented to an amendment of the Expiration Date included in the AWAC Lease or any other agreement. Thus, Bombardier's support obligations remained conditioned on TVPX's timely return of the Aircraft according to the dates specified in the SAA and Residual Agreement. TVPX's breach of contract claims thus fail as a matter of law.

### B. TVPX's claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law.

Under New York law, "all contracts imply a covenant of good faith and fair dealing in the course of performance."[90] The implied covenant "encompasses any promises that a reasonable promisee would understand to be included."[91] The covenant thus "can only impose an obligation consistent with other mutually agreed upon terms in the contract."[92] "It does not add to the contract a substantive provision not included by the parties."[93] Although a matter of contract,

---

[88] *Beardslee v. Inflection Energy, LLC*, 761 F.3d 221, 231 (2d Cir.) (citation omitted).

[89] Dkt. 39-4 § 7 at BOM_000114.

[90] *511 W. 232nd Owners Corp. v. Jennife Realty Co.*, 98 N.Y.2d 144, 153 (App. Div. 2002).

[91] *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (App. Div. 1995).

[92] *Fellows v. CitiMortgage, Inc.*, 710 F. Supp. 2d 385, 407 (S.D.N.Y. 2010) (citing *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198–99 (2d Cir.2005)).

[93] *Id*.

15

New York law does not "'recognize a separate cause of action for breach of the implied covenant of good faith and a breach of contract on the same facts.'"[94] "However, where the existence or meaning of a contract is in doubt, a party may plead a claim for breach of the covenant of good faith and fair dealing in the alternative."[95]

TVPX claims Bombardier breached the implied covenant in two ways—by "(1) refusing to execute documents to confirm and ratify its obligations to the Owner Participant under the Residual Agreement; and (2) continuing to claim it is not obligated to the Dougherty Trust under the Residual Agreement."[96] The court concludes for the reasons below that TVPX's breach of the implied covenant claim fails as a matter of law.

With respect to TVPX's first argument, it points to no provision in the Residual Agreement that is consistent with its position that Bombardier assumed an obligation to ratify its support obligations to TVPX. To the contrary, the Residual Agreement expressly permits Bombardier to exercise its own discretion concerning whether it will modify its support obligations.[97] TVPX's attempt to impose contractual obligations inconsistent with the plain terms of the Residual Agreement are therefore unavailing.

TVPX's second argument fails because its implied covenant claim is merely a recycled version of TVPX's breach of contract claim. The same facts underlying TVPX's breach of contract claim animate the discussion of whether Bombardier is obligated to TVPX under the

---

[94] *Hard Rock Cafe Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F. Supp. 2d 552, 567 (S.D.N.Y. 2011) (citing *Fellows*, 710 F. Supp. 2d at 407).

[95] *Id.*

[96] Dkt. 54 at 38.

[97] *See* dkt. 39-4 § 7 at BOM_000114 (stating "unless otherwise consented to in writing by Bombardier, the obligations of Bombardier hereunder shall not be affected in any manner by any consent, waiver, amendment, modification or supplement to the Lease or any other Operative Agreement as in effect on the date of the execution and delivery of this Agreement").

16

Residual Agreement. TVPX is prohibited from maintaining a separate claim for breach of contract and breach of the implied covenant on the same facts where the meaning of the contract is not in doubt—as is the case here. TVPX's implied covenant claim fails as matter of law.

### C. TVPX's claim for promissory estoppel fails as a matter of law.

TVPX maintains that Bombardier is promissorily estopped from denying its support obligations because it made an "unqualified and unconditional" promise to "perform its obligations" under its Manufacturer's Consent attached to the Third Assignment.[98] Under New York law, the elements of a promissory estoppel claim are: (i) a sufficiently clear and unambiguous promise; (ii) reasonable reliance on the promise; and (iii) injury caused by the reliance.[99] It is well settled, however, that "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."[100]

TVPX's promissory estoppel claim fails because there are valid and enforceable contracts that govern this dispute. TVPX admits the SAA, the Residual Agreement, and the Third Assignment govern the performance obligations of the parties.[101] Indeed, TVPX relies on these agreements and seeks to enforce them. Further, the promise TVPX relies upon—that Bombardier agrees to "perform its obligations" under the Manufacturer's Consent— is also governed by a valid and enforceable contract—the Manufacturer's Consent—which precludes TVPX's promissory estoppel claim. TVPX's promissory estoppel claim fails as a matter of law.

---

[98] Dkt. 68 at 13 (Sealed).

[99] *See Castellotti v. Free*, 27 N.Y.S.3d 507, 513 (N.Y. App. Div. 2016).

[100] *O'Grady v. BlueCrest Capital Mgmt. LLP*, 111 F. Supp. 3d 494, 504 (S.D.N.Y. 2015), *aff'd*, 646 F. App'x 2 (2d Cir. 2016).

[101] Dkt. 64 at 9.

## IV. CONCLUSION

For the foregoing reasons, Bombardier's Motion for Summary Judgment[102] is GRANTED and TVPX's Partial Motion for Summary Judgment[103] is DENIED. As a result of the court's grant of summary judgment in favor of Bombardier, TVPX's Motion in Limine is DENIED as MOOT.[104]

SO ORDERED this 30th day of September, 2019.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge

---

[102] Dkt. 38.

[103] Dkt. 34.

[104] Dkt. 33.